Mazzarelli, J.P. (dissenting).
In an unrelated litigation, petitioner Verizon New England Inc. (Verizon) secured a judgment against nonparty Global NAPs, Inc. (Global) in the amount of $57,716,714. On March 30, 2009, Verizon served respondent Transcom Enhanced Services, Inc. (Transcom), a regular customer of Global, with a restraining notice and information subpoena. Transcom admits to receiving those documents on or about April 2, 2009. The restraining notice directed Transcom *212 not “to make or suffer any sale, assignment or transfer of, or interference with, any property in your possession in which [Global] . . . has as interest.” It “applie[d] to all property in which [Global] . . . presently has or is believed to have an interest, and to all property hereafter coming into the possession or custody of [Global].”
Transcom had purchased telecommunications services from Global since 2003, when the two companies entered into a “Telephone Switch Service Agreement.” While the agreement did not require Transcom to purchase services from Global, it established the framework that would be utilized if it did. Should Transcom order services from Global, the agreement required Transcom to pay Global’s monthly charges in two installments and pay Global “the set up fee and the first one half of the monthly trunk charge prior to providing] service. Subsequent one half of the monthly trunk charges will be billed in advance of the half of the month to which they apply,” with payments to “be made without set off.” The agreement was subject to an initial six-month term, to be automatically renewed on a monthly basis, unless either party provided the other with 30 days’ written notice of its intent not to renew and could be amended only by a writing.
In responding to the information subpoena, Transcom identified the agreement and stated that “[c]urrently, the Agreement requires payment of a monthly recurring charge of $28,000 per circuit for eight (8) circuits, along with additional charges of $57,000 per month.” However, when asked to identify all receivables or outstanding obligations owed by it to Global, Transcom replied in its response to the information subpoena that there were “[njone. All payments are made in advance or contemporaneously with service.” In response to a question requesting any payments made by Transcom to Global within the last five years, Transcom attached a ledger called a “Vendor Balance Detail” (VBD). This showed all of the transactions between Transcom and Global from December 1, 2004 through January 27, 2010. The VBD reflected that, on April 1, 2009, the day before its acceptance of the restraining notice, Transcom received a $246,000 bill from Global and that prior to that there had been a zero dollar balance. The bill was paid in four checks, each in the amount of $61,500. The first check was issued on April 1, leaving an outstanding balance of $184,500. The other three checks were paid on April 6, April 15 and April 21. The VBD reflects a pattern of Transcom paying amounts owed in *213 weekly installments, with more than $2.4 million in payments made to Global between April 2, 2009 and January 27, 2010.
Verizon commenced this special proceeding seeking to compel Transcom, among other things, to turn over to it monies which it paid to Global after receipt of the restraining notice, and for a finding of civil contempt. Verizon asserted that Transcom’s agreement with Global created an ongoing contractual relationship which required Transcom to pay Global $281,000 per month. In response, Transcom argued that it did not violate the restraining notice because Global’s monthly invoices were issued in advance of services being rendered. According to Transcom, the invoices were essentially offers to provide service and imposed no obligation on Transcom to make any payments at all. Thus, Transcom claimed, Global never had an expectation of payment from Transcom which could have served as the basis for attachment by Global’s judgment creditors.
The court scheduled the matter for a hearing. At that hearing, Transcom called two witnesses. The first was Larry Dewey, Transcom’s chief accounting officer. Dewey was responsible for paying and recording Global’s invoices. He stated that Transcom never owed money to Global because it prepaid for services rendered the following week, making payments for the month in four equal installments. Dewey explained that the April 1, 2009 entry in the VBD referred to a March 1 invoice for services to be rendered in April. As the invoice was for April charges, Dewey entered it in the system for that month as an accounts payable item. He conceded that, on its face, the VBD reflected a $246,000 accounts payable to Global on April 1, 2009, and a $184,500 debt to Global as of April 2. However, he explained that such a view of “the records would be incomplete,” because Transcom did not owe Global any money as of April 2, 2009, and the balance listed as of that date was for services which had not yet been provided. Dewey also testified that Global was a vendor with no affiliation to Transcom. He was unaware of the agreement’s renewal term and stated that the parties had not operated according to the agreement’s terms, as Transcom made payments weekly instead of twice per month. Dewey also testified that Transcom never sent Global a notice of termination.
The second witness for Transcom was Scott Birdwell, its chief executive officer. Birdwell testified that Transcom’s relationship with Global had been “strained” for years, due to poor service quality, and because Global often lost markets without notice *214 and frequently lied about the cause of service outages. He also stated that Transcom did not trust Global’s reliability to provide service or its financial condition and that, therefore, the parties’ course of conduct departed from the terms of the agreement. Indeed, Birdwell explained that for several years the parties had been operating pursuant to a verbal arrangement whereby Transcom prepaid for services one week in advance, committing itself to take services only for the week covered by the prepayment. After the week, if Global’s service were still running, Transcom would then pay for the following week. Birdwell testified that the parties had orally amended the agreement, had not entered into any other written agreement, and that Transcom never issued a written notice terminating the agreement.
Birdwell further testified that Transcom had 10 to 20 alternative vendors it could use to provide services in areas covered by Global, and switching to one such provider would involve only “[a] few key strokes on a computer,” and be complete in 30 to 60 seconds. Nevertheless, Birdwell stated, Transcom had not discontinued business with Global, as while “[i]t is practical, from a technical perspective . . . [i]t does cost us more, in some cases, to move off of Global.” On or about April 2, 2009, Bird-well learned of the restraining notice, but did not direct Dewey to stop making prepayments to Global. He did, however, check to make sure that Transcom owed nothing to Global. While Birdwell conceded that Dewey’s “working payments [the VBD] indicate there are” payables, the “point of fact is, there was no amounts owed to [Global] at that point in time.” Verizon did not call any witnesses to testify at the hearing.
The court denied the petition in its entirety and vacated the restraining notice (27 Misc 3d 1236[A], 2010 NY Slip Op 51073[U] [2010]). It credited the testimony of Dewey and Bird-well and found that Transcom established that the business relationship with Global was indeed based on prepayment for services and that Transcom was not bound to accept additional services. The court further found that the prepayment for services was not a form of property or debt subject to restraint as the “principle feature of economic significance” was that Transcom had no obligation to purchase services from Global and was thus not in possession of property in which Global had an interest (2010 NY Slip Op 51073[U], *5). The court stated that “[i]n light of this economic reality . . . there is no property or debt in the instant matter subject to a restraining order, levy or turnover pursuant to Article 52 of the CPLR” (id.).
*215 CPLR 5222 (b) provides that a restraining notice is effective against a person only if “at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest.” Further, “[a] money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor” (CPLR 5201 [a]), and “[a] money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested” (CPLR 5201 [b]).
The Court of Appeals has defined what constitutes property for purposes of being subject to a restraining notice in ABKCO Indus. v Apple Films (39 NY2d 670 [1976]), which is the leading decision on the subject. In that case, the recipient of a restraining notice, a film promoter, had entered into a licensing agreement with the judgment debtor, a film owner, pursuant to which the promoter was required to pay royalties to the owner if the former’s efforts to promote the film realized profits. However, at the time the judgment creditor served the promoter with a restraining notice, the film had not realized a profit, so it owed the film owner nothing. The Court of Appeals held that the restraining notice was nevertheless effective, because the owner’s interest in the licensing agreement “constituted property, composed of the bundle of all its rights under the Agreement, of which, of course, the obligation of [the promoter] to pay [owner] under the [royalty] clause was the principal feature of economic significance. That property was attachable because concededly it was assignable by [the judgment debtor]” (39 NY2d at 674, citing CPLR 5201 [b]).
The only difference between this case and ABKCO is that here Transcom was not obligated to turn over monies to Global at any specific time. However, that is not dispositive. Indeed, in Matter of Supreme Mdse. Co. v Chemical Bank (70 NY2d 344, 350 [1987]), the case on which Transcom most heavily relies, the Court of Appeals stated that “[d]ispositive instead is whether [a property] interest has potential economic value to the creditor.” In Supreme Mdse. Co., the Court found that the asset which was sought to be restrained, a letter of credit issued in favor of the judgment debtor who was the seller in an international transaction, did not have such value. The recipient of the restraint (an order of attachment), was the bank that *216 had issued the letter of credit. When the restraint was issued, the seller had not yet satisfied the terms of the letter of credit. The Court of Appeals determined that the letter was executory and not subject to restraint. In so holding, the Court stated that “[a] guiding principle in our analysis is that, while CPLR 5201 is obviously intended to have broad reach, still the Legislature expressly put beyond the grasp of the statute the general category of contingent debts, ‘to preclude a levy against contingent obligations not certain to ripen into something real’ ” (70 NY2d at 350, quoting Siegel, NY Prac § 323, at 389).
The Court’s focus in Supreme Mdse. Co. on whether the interest sought to be restrained has economic value to the judgment creditor supports Verizon’s position here. Thus, Transcom’s and the majority’s reliance on Supreme Mdse. Co. is unavailing. As the majority acknowledges, the Court of Appeals in Supreme Mdse. Co. was particularly concerned about subjecting letters of credit to restraints, since such instruments are a primary facilitator of international commerce. There is no comparable public policy concern here.
Transcom should not be allowed to ignore the restraining notice when it had every reason to predict that it would continue to do business with Global. Transcom and Global had a highly regular and predictable business relationship which was all but certain to, and in fact did, continue to generate revenues after Transcom received Verizon’s restraining notice. Indeed, despite Birdwell’s testimony that Transcom found Global to be an unreliable partner and that it had the right to switch to another service provider at any time, it never actually did so. Transcom consistently used and paid for Global’s services beginning in December 2004 and continued to do so even after it received Verizon’s information subpoena over five years later.
Moreover, the pattern of conduct here demonstrates that at the time it received the restraining notice from Verizon, Transcom should have been reasonably “certain” that its relationship with Global had “ripen[ed] into something real” (70 NY2d at 350). The timing is critical because the touchstone is whether a judgment debtor has a particular property interest held by a garnishee at “the time of service” of the restraining notice (CPLR 5222 [b]). By focusing on the series of events that might or might not occur after Transcom’s receipt of the restraining notice, the majority ignores this provision.
Further, the majority’s bald speculation that had Transcom stopped payment on the check, which was sent the day before *217 receipt of the restraining notice, it would have placed itself at risk of not receiving services in return, is irrelevant. While this would have been unfortunate, it does not override the need for full compliance with proper judgment enforcement mechanisms. Indeed, just as Transcom may find itself without a business partner if it redirects payment to Verizon, so too might a valued employee stop working for an employer forced to garnish his or her wages, when he receives his or her first diminished paycheck. These are simply accepted risks of the collection system. Nor would my view place Transcom in a different position than other creditors who make a decision to deal with entities that seek to evade their just obligations. In fact, the manner in which Transcom structured its transactions with Global could be said to reveal its knowledge of Global’s plan to shirk its responsibilities to Verizon. The majority’s narrow view of what constitutes property for purposes of CPLR article 52, judgment debtors and those who transact business with them places in its hands a virtual road map for frustrating the efforts of judgment creditors. The goal of article 52, to promote and ensure the enforceability of money judgments, is too critical to the conduct of commerce in this state to permit that to happen. In light of the clear property interest that Global had in Transcom’s payments based on the latter’s long and consistent history of making those payments, the laudable purpose of the statute is undermined by the majority’s decision to not require Transcom to abide by Verizon’s restraining notice.
Accordingly, I believe that Global had a “future interest” in payments from Transcom that constituted property pursuant to the plain language of CPLR 5201 (b), and which was subject to restraint.
Renwick and Richter, JJ., concur with Catterson, J.; Mazzarelli, J.P., and Friedman, J., dissent in a separate opinion by Mazzarelli, J.P.
Judgment, Supreme Court, New York County, entered July 20, 2010, affirmed, with costs.